IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| CYNTHIA MOWERY AND<br>BRIAN ALEXANDER, | * | |
| | * | |
| Plaintiffs, | * | |
| v. | * | Civil Case No. 1:19-cv-00845-JMC |
| | * | |
| BARRY SMITH, *et al*, | * | |
| Defendants. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## **MEMORANDUM OPINION**

This suit arises out of injuries allegedly sustained by Cynthia Mowery and Brian Alexander, (collectively, the "Plaintiffs"), while attending entry-level police officer training at the Eastern Shore Criminal Justice Academy (the "Academy"). The Academy is operated by Wor-Wic Community College ("Wor-Wic") under its criminal justice department. Defendant John C. Moses ("Mr. Moses") is head of that department, Donald Rollyson ("Mr. Rollyson") served as director of the Academy, and Barry Smith ("Mr. Smith") served as an instructor (collectively, the "Defendants"). Pursuant to Standing Order 2018-4 and 28 U.S.C. § 636(c), this case was assigned directly to a magistrate judge and the parties consented to proceed before that magistrate judge. (ECF No. 19). Plaintiffs advance claims of negligence, negligent hiring, as well as violations of Title IX and 42 U.S.C. § 1983. (ECF No. 1). Now pending is Defendants' Motion for Summary Judgment/Partial Summary Judgment as to all negligence-based claims. (ECF No. 23). The issues are fully briefed, (ECF Nos. 23, 25, and 26), and no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2018). For the reasons that follow, Defendants' motion will be GRANTED.

## I. BACKGROUND

### A. Ms. Mowery's Injuries

Wor-Wic operates the Academy as part of its criminal justice department to provide training to law enforcement recruits and cadets in Salisbury, Maryland. (ECF No. 1 at ¶ 11). Wor-Wic hired Mr. Smith as a defensive tactics instructor at the Academy after his employment with the Maryland State Police. (*Id.* at ¶¶ 12-13, 29). In January 2017, Ms. Mowery was accepted into the Elkton State Police Department and was sent for entry-level law enforcement training at the Academy. (*Id.* at ¶ 31). During sessions taught by Mr. Smith, Ms. Mowery was required to participate in five fight practical scenarios that involved boxing with minimal safety equipment. (*Id.* at ¶¶ 32-33). In the fight scenarios, she participated despite allegedly sustaining multiple blows to the head. (*Id.* at ¶ 34). After each fight scenario Ms. Mowery was asked if she was injured, and each time she indicated that she was not. (ECF Nos. 23-7, 23-8, 23-9, 23-10, and 23-11). Mr. Smith, in consultation with Mr. Rollyson and Mr. Moses, determined that Ms. Mowery failed her training due to the number of blows she sustained and would have to wait a week to try again. (ECF No. 1 at ¶¶ 35-38). Defendants did not recommend that Ms. Mowery receive any medical treatment for the blows she received. (*Id.* at ¶ 40).

Following her participation in the fight scenarios, Ms. Mowery alleges that she began to experience dizziness, headaches, and difficulty sleeping. (*Id.* at ¶ 41). In addition to the injuries she sustained during the fight scenarios, Ms. Mowery alleges separate instances where Mr. Smith injured her during her time at the Academy. (*Id.* at ¶ 49). Specifically, she alleges that Mr. Smith continued to maintain his knee and arm on the back of her neck despite her screams for help and attempts to tap out during the pain compliance portion of the program. (*Id.*). On May 25, 2017,

Ms. Mowery resigned from the Academy. (*Id.* at ¶¶ 43-44). She is currently employed as a police officer in the Aberdeen Police Department. (ECF No. 23-1 at 4).

### B. Mr. Alexander's Injuries

Upon graduating from Harrisburg Community College, Mr. Alexander accepted a position with the Ocean City Maryland Police Department and was required to attend the Academy. (ECF No. 1 at ¶ 51). Roughly a month into the Academy, Mr. Alexander was participating in a boxing exercise when Mr. Smith allegedly instructed the participants to use full force. (*Id.* at ¶ 52). During this exercise, Mr. Alexander was struck in the head and lost consciousness. (*Id.* at ¶¶ 52-53). Mr. Alexander alleges that the Defendants failed to perform any evaluation of him once he went unconscious. (*Id.* at ¶ 54). In spite of Defendants' alleged inaction, another trainee called "911" and paramedics arrived approximately ten minutes later. (*Id.* at ¶ 54). Mr. Alexander suffered a brain bleed which required surgery. He now alleges permanent neurological and cognitive defects rendering him unable to work as a law enforcement officer. (*Id.* at ¶¶ 55-56).

### C. The Waiver

Before Plaintiffs were allowed to attend the Academy, they were required to execute a Waiver and Release of Liability Form ("Waiver") to shield Defendants from claims arising from injuries sustained during Plaintiffs' time at the Academy. Specifically, the Waiver provided that Plaintiffs shall "release and discharge any and all claims for damages for death [or] personal injury . . . as a result of [their] participation" against "Wor-Wic Community College/ Eastern Shore Criminal Justice Academy and their respective directors, agents, employees, representatives, volunteers, and organizers of any activities." (ECF No. 23-1 at 3). Plaintiffs acknowledge that they read and understood the terms of the Waiver and voluntarily elected to

3

execute the Waiver as a condition of their participation at the Academy. (ECF Nos. 23-1, 23-2, and 23-3). Now Defendants argue that Plaintiffs' suit is barred by these waivers.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) requires the Court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden "to demonstrate the absence of any genuine dispute of material fact." *Jones v. Hoffberger Moving Servs. LLC*, 92 F.Supp.3d 405, 409 (D. Md. 2015) (internal citations omitted). A dispute as to a material fact "is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *J.E. Dunn Const. Co. v. S.R.P. Dev. Ltd. P'ship*, 115 F.Supp.3d 593, 600 (D. Md. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

A nonmoving party "opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). The court is "required to view the facts and draw reasonable inferences in the light most favorable to" the nonmoving party, *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008) (citing *Scott v. Harris*, 550 U.S. 372, 377 (2007)), but must also "abide by the 'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Heckman v. Ryder Truck Rental, Inc.*, 962 F.Supp.2d 792, 799–800 (D. Md. 2013) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)).

## III. DISCUSSION

Plaintiffs advance a variety of negligence-based claims against the Defendants. As a threshold matter, they contend Wor-Wic was negligent for hiring Mr. Smith as a defensive tactics instructor because he was allegedly unqualified. (ECF No. 1 at ¶¶ 14-15). Plaintiffs further maintain that the Academy's defensive tactics curriculum was negligently designed and unreasonably dangerous for participants. In addition, Plaintiffs claim that Defendants failed to take appropriate action to evaluate and treat injuries sustained by Plaintiffs. Defendants respond by arguing that the terms of the Waiver clearly and unambiguously bar Plaintiffs' claims.

While not challenging the validity of the Waiver, Plaintiffs contend that public policy dictates that the Court should not enforce the Waiver under the circumstances.

Plaintiffs first challenge the validity of the Waiver by pointing to the fact that they purportedly canceled the Waivers approximately two years after they sustained their injuries. In Plaintiffs' view, this cancellation should be applied retroactively and their claims should not be barred. Secondly, Plaintiffs argue that if the Waiver is indeed valid, then public policy dictates that the Court should not enforce its terms. The Court finds that neither of Plaintiff's defenses defeats the Waivers and thus Defendants' motion for partial summary judgment will be granted as to the negligence-based claims.

### A. The Waiver

In Maryland, it is well settled and "consistent with the public policy of freedom of contract that exculpatory contractual clauses generally are valid." *Adloo v. H.T. Brown Real Estate, Inc.*, 344 Md. 254, 259 (1996). Further, courts generally will not invalidate exculpatory clauses because of the presumption that a party "will undertake the responsibility of looking out for himself." *Winterstein v. Wilcom*, 16 Md. App. 130, 135 (1972). While an exculpatory clause will

generally be enforceable, it will also be narrowly construed because such clauses often bring about harsh results. *Cornell v. Council of Unit Owners Hawaiian Vill. Condominiums, Inc.*, 983 F. Supp. 640, 643 (D. Md. 1997). Therefore, in order for the terms to be enforced, the terms must be unambiguous and must "clearly[,] and specifically indicate[ ] the intent to release the defendant from liability for personal injury caused by the defendant's negligence," although "the exculpatory clause need not contain or use the word 'negligence.'" *Id.* at 266. Such a clause must define the scope of liability from which the parties "clearly, unequivocally, specifically, and unmistakably express [their] intention to exculpate the [defendant]." *Id.* at 267.

In the case at bar, the Waiver reads:

> I hereby waive, release and discharge any and all claims for damages for . . . personal injury . . . as a result of my participation in said training, or any aspect thereof . . .
>
> This release is intended to discharge in advance Wor-Wic Community College/Eastern Shore Criminal Justice Academy and their respective directors, agents, employees, representatives, volunteers and organizers of any activities from and against any and all liability arising out of or connected in any way with my participation in training, or any related aspect thereof, *including but not limited to liability arising out of negligence or carelessness on the part of persons or entities mentioned above*.
>
> I further understand that accidents can occur during public safety training or related activities in the course of training and the participation in such activities can result in serious personal injury, as a consequence thereof. Knowing and appreciating such risks, nevertheless, I hereby agree to assume those risks and to release and hold harmless all of the persons or entities mentioned above who (*through negligence or carelessness*) might otherwise be liable to me (or my heirs or assigns) for damages.

(ECF No. 23-2) (emphasis added).

Neither party disputes that the terms of the Waiver clearly and unambiguously cover claims of negligence arising during Plaintiffs' tenure at the Academy. By execution of the Waiver, Plaintiffs agreed to "discharge any and all claims for damages for . . . personal injury . . .

6

which may hereafter accrue to me as a result of my participation in said training . . . [including] liability arising out of negligence." (ECF No. 23-2). While the Waiver was not required to use the word "negligence" in order to cover negligence based claims, it expressly provided that it was covering claims "arising out of *negligence*" and that it intended to discharge individuals who "(through *negligence* or carelessness)" might otherwise be liable. (ECF No. 23-2) (emphasis added). The Waiver therefore clearly and unambiguously provides that Defendants shall be shielded from liability for personal injuries sustained by Plaintiffs during their time at the Academy due to Defendants' negligence.

Plaintiffs assert that the Waiver is no longer enforceable against them because they retracted their releases over two years after sustaining their alleged injuries. (ECF No. 25 at 18-19). Their argument hinges on language in the Waiver providing that the Waiver "will remain effective . . . until and unless express written notice of cancellation is received." (*Id.*). According to Plaintiffs, this language authorized Plaintiffs to retroactively cancel the Waiver. (*Id.* at 19). As Defendants point out, however, this interpretation would render the Waiver effectively meaningless. (ECF No. 26 at 9). In the event Defendants ever attempted to invoke the Waiver, Plaintiffs could simply cancel the Waiver to avoid the Waiver's effects. Maryland law has settled that contracts should not be interpreted in a manner that would render their terms meaningless. *Calomiris v. Woods*, 353 Md. 425, 441 (1999) ("[C]ourts should avoid interpreting contracts so as to nullify their express terms"). Plaintiffs cannot retroactively cancel the Waiver merely because the terms of the Waiver no longer work to their benefit. *See Cheek v. United Healthcare of Mid-Atl., Inc.*, 378 Md. 139, 173–74 (2003) (citation omitted) ("no party has a right to rescind or modify a contract merely because he finds, in the light of changed conditions, that he has

7

made a bad deal."). Accordingly, the Court finds that the Waiver was binding over the conduct of the parties during the period at hand.

## B. Exceptions to A Waiver

Plaintiffs next argue that this Court should not enforce the Waiver because it falls within an exception to enforceability recognized by Maryland law. Plaintiffs are correct that while waiver clauses are generally valid, there are certain exceptions that will prompt a Court to refuse enforcement. *Wolf v. Ford*, 335 Md. 525, 530 (1994). Specifically, a waiver may be deemed unenforceable when: (1) it attempts to excuse liability for intentional harms or forms of gross negligence; (2) it is the product of grossly unequal bargaining power; or (3) public interest prohibits enforcement. *Id.* at 531-32. Plaintiffs contend that each of the exceptions above apply to the instant case. Naturally, Defendants argue that none of these exceptions apply. The Court agrees with the Defendants.

### 1. There is No Evidence of Intentional Harms or Gross Negligence

Plaintiffs claim that the Waiver is ineffective to bar their claims because Defendants were grossly negligent in designing the course and in having Mr. Smith serve as an instructor due to an alleged lack of qualifications. (ECF No. 25 at 6). Specifically, they point to the fact that Mr. Smith never received formal training on how to teach a boxing program nor received training relevant to first aid or head injuries. (*Id.* at 7). With respect to Ms. Mowery in particular, Ms. Mowery claims that Defendants exhibited grossly negligent behavior when they failed to perform an evaluation of her after they observed her sustain multiple blows to the head during her training. (*Id.*). For his part, Mr. Alexander claims that Defendants were grossly negligent because participants were instructed to use full force and none of the Defendants provided assistance when he went unconscious. (*Id.* at 5).

Defendants maintain that Plaintiffs' allegations at most constitute ordinary negligence. They note that participants wore headgear, boxing gloves, and mouth guards, which evidence that the Defendants instituted safeguards to protect participants from injury. (ECF No. 26 at 4). In addition, Defendants point out that each participant was asked about their condition after each fight scenario, which demonstrates that Defendants were concerned with participant safety. (*Id.* at 3). In particular, Ms. Mowery was required to wait a week before continuing after Defendants observed that she had sustained too many blows to the head. (*Id.*). With respect to Mr. Alexander's contentions, Defendants note that Mr. Alexander's injuries occurred during an exercise where participants were required to be on their knees, which is a technique used to reduce the risk of injury. (*Id.* at 4). As to Mr. Alexander's argument that Defendants were grossly negligent in failing to provide him assistance when he was unconscious, Defendants direct the Court's attention to the fact that another trainee called "911" and that Mr. Alexander received medical attention within minutes of the phone call. (*Id.*). While Defendants do not squarely address Plaintiffs' arguments centered on Mr. Smith's perceived lack of qualifications, Plaintiffs themselves concede that Mr. Smith was certified in defensive tactics and had decades of experience serving as a defensive tactics instructor. (ECF No. 25 at 7).

The existence of gross negligence is generally a question of fact for the jury, but can be a question of law to be decided by the Court when reasonable men could not differ as to the rational conclusion reached. *Rodriguez v. State*, 218 Md. App. 573, 598 (2014). Gross negligence is the "intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life . . . of another, and . . . [one] is guilty [of gross negligence] . . . when he inflicts injury intentionally or is so utterly indifferent to the rights of others." *Bank of Am., N.A. v. Jericho Baptist Church Ministries, Inc.*, No. PX 15-02953, 2017 WL 193498, at *6 (D. Md. Jan.

17, 2017) (citing *Romanesk v. Rose*, 248 Md. 420, 423 (1968)). Further, "whether an accused's conduct constituted gross negligence must be determined by the conduct itself and not by the resultant harm." *Mills v. State*, 13 Md. App. 196, 200, 282 A.2d 147, 149 (1971), *cert. denied*, 264 Md. 750 (1972).

With respect to Plaintiffs' contentions regarding gross negligence, the case of *Boucher v. Riner* is instructive. 68 Md. App. 539 (1986). In *Boucher*, the plaintiff was a student of the Naval Academy where he joined the Naval Academy Parachuting Club ("the Club") as an extracurricular activity. *Id.* at 540. The Club had an agreement with Parachutes Are Fun, Inc. ("Parachutes") for use of Parachutes' drop zone for training purposes. *Id.* Prior to plaintiff's first jump, he received training from two upperclassmen, which included instructions regarding the hazards of parachuting in an area near uninsulated electrical lines. *Id.* at 541. Prior to boarding the plane for his first jump, plaintiff signed a waiver form in which plaintiff agreed not to sue for any "loss, damage, or injury results from the negligence of the Corporation, its officers, agents, servants, employees or lessors or from some other cause." *Id.* While in the plane, it was determined that the wind conditions were suitable for a jump. *Id.* Two students who jumped before the plaintiff had no issues. *Id.* Plaintiff then jumped from the plane and was guided when to make position changes by the instructors. *Id.* During the jump, one of the instructors noticed that plaintiff's back was facing the electrical lines and gave no indication of danger to the plaintiff. *Id.* Seconds later, plaintiff collided with the electrical lines, which sent 12,500 volts of electricity through his body. *Id.* After the incident, plaintiff sued and asserted the defendants were grossly negligent in performing their duties since he was under their instruction during the entirety of the descent and they failed to warn him of the power lines. *Id.* at 542-43.

The trial court granted summary judgment in favor of the defendants given the execution of the waiver form and, on appeal, the Maryland Court of Special Appeals affirmed. In reaching this decision, the Court held that the allegations against the defendants did not amount to gross negligence. *Id.* The Court noted that the instructor was attentive to plaintiff's descent, was stationed in the proper location, and was calling out instructions. Accordingly, the Court ruled "the conduct alleged here reflects, at worst, poor judgment on the part of [defendants] that, while perhaps amounting to ordinary negligence, does not rise to the level of gross negligence." *Id.* at 548.

As in *Boucher*, Defendants were closely supervising the trainees during the fighting scenarios and the participants were provided safety gear. In *Boucher*, the Court of Special Appeals held that an exculpatory clause could be enforced against a plaintiff alleging that he was electrocuted due to the defendant's failure to warn him of power lines because such allegations did not constitute gross negligence. In the case at hand, Plaintiffs allege that Defendants were responsible for their injuries because they failed to monitor them closely enough and failed to institute sufficient safeguards to protect them. While the safeguards instituted by Defendants were ultimately unable to protect Plaintiffs from harm, *Boucher* compels the conclusion that Defendants' conduct at most amounted to ordinary negligence that would be covered by the language of the Waiver.

Even in the light most favorable to Plaintiffs, the circumstances fail to constitute gross negligence. Defendants instituted safeguards to protect Plaintiffs and regularly asked Plaintiffs after each scenario whether they had been injured. (ECF Nos. 23-7, 23-8, 23-9, 23-10, and 23-11). Defendants also required that participants box while on their knees to reduce the likelihood of severe injury. The existence of these safeguards demonstrates that Defendants did not

recklessly disregard the risks of the combat exercises but rather were mindful of them and took steps to prevent the injuries that Plaintiffs ultimately sustained. At the heart of each of Plaintiffs' negligence based claims is that the safeguards instituted by Defendants to protect Plaintiffs were insufficient, which placed Plaintiffs at an unreasonable risk of injury. The law is settled in Maryland, however, that such allegations do not amount to gross negligence. *See Kuykendall v. Young Life*, 261 F. App'x 480, 490 (4th Cir. 2008) (affirming summary judgment in favor of an operator of a ropes course, holding that he was not grossly negligent even though the plaintiff fell 30 feet while on the course because the plaintiff received training and safety instructions before participating); *see also Plummer v. State*, 118 Md. App. 244, 268-69 (1997) (finding, in a context not addressing exculpatory clauses, that the defendant was not grossly negligent when he struck and killed a child in a school zone with his car even though he failed to respond to a motorist who attempted to warn him of drifting and fled the scene after the incident). For the above reasons, Defendants have met their burden in showing that there was no gross negligence or intentional harms that would prompt this could to not enforce the Waiver. Therefore, the Waiver remains enforceable

### 2. There Was No Unequal Bargaining Power

Next, the Plaintiffs claim that the Waiver is unenforceable because there was disparate bargaining power between the parties evidenced by the fact that the Waiver was a contract of adhesion. (ECF No. 25 at 9). The Plaintiffs point to the fact that they were unable to "choose another location for their training and neither could have voluntarily attended another academy." (*Id*. at 10). Further, neither Plaintiff was "given an opportunity to vary [the Waiver's] terms or to purchase or secure additional protections from injury caused by the negligence of the Defendants." (*Id*.). By contrast, Defendants direct the Court's attention to the fact that Plaintiffs

"voluntarily chose to try to become police officers, knowing the type of training that would be necessary to prepare them to be in a position to defend and protect themselves." (ECF No. 23-1 at 7). The Court agrees with Defendants that the bargaining power between the parties in this case does not amount to that which would prompt this Court not to enforce the Waiver.

A contract of adhesion is "one that is drafted unilaterally by the dominant party and then presented … to the weaker party who has no real opportunity to bargain about its terms." *Meyer v. State Farm Fire & Cas. Co.*, 85 Md. App. 83, 89 (1990). The Plaintiffs are correct that the Waiver was a contract of adhesion because the Waiver was prepared by Defendants and Plaintiffs were not afforded an opportunity to negotiate its terms. Nevertheless, "that fact alone does not demonstrate that [Defendants] had grossly disparate bargaining power." *Alexander v. Sports Auth., Inc.,* No. CIV.A. DKC 2007-0479, 2007 WL 1745328, at *5 (D. Md. June 14, 2007). "To possess a decisive bargaining advantage over a customer, the service offered must usually be deemed essential in nature." *Seigneur v. Nat'l Fitness Inst., Inc.,* 132 Md. App. 271, 283 (2000). Essential services include "public utilities, common carriers, innkeepers, and public warehousemen" and other "transactions that are so important to the public good that an exculpatory clause would be patently offensive, such that the common sense of the entire community would ... pronounce it" invalid. *Wolf*, 335 Md. at 532 (internal quotations omitted).

Each of the services that have been deemed essential are services that are of importance to the public as a whole as opposed to a particular group. *See Seigneur*, 132 Md. App. at 288 ("The services offered by a health club are not of great importance or of practical necessity to the *public as a whole*.") (Emphasis added). In *Seigneur,* the Court of Special Appeals of Maryland held that gym club membership was not an essential service and therefore found that there was no unequal bargaining power between a fitness club and a member in the context of an

exculpatory clause. *Id.* at 290. By the same token, while the training offered by the Academy may have been important to the Plaintiffs, the services offered by the Academy are not so essential to the public as a whole as to make the Waiver voidable. *See Wolf*, 335 Md. at 537 (holding that the stockbroker-client relationship does not affect the general public since the individuals freely chose to invest their money and should have known the risks associated with such).

The services offered by the Academy only pertain to a very small group of qualified individuals who seek to pursue employment as a police officer and do not impact the public as a whole. In addition, the training offered at the Academy was available elsewhere, which is evidenced by the fact that Ms. Mowery was able to become a police officer in Aberdeen without completing training at Academy. (ECF No. 23-1 at 4). Thus, the bargaining power of the parties was not so disparate as to put Plaintiffs at the mercy of Defendants' negligence. *Wolf*, 335 Md. at 532. For the above reasons, Defendants have met their burden in showing that there was no disparate bargaining power between the parties. Therefore, the Waiver remains enforceable.

### 3. The Waiver Is Not Contrary to Public Policy

Plaintiffs' final argument is that the Waiver should be nullified due to public policy considerations. Plaintiffs argue that the exculpatory clause violates public policy because the Academy provides an essential service to the public in that it facilitates the training and qualification of police officers, which satisfies a great public need. (ECF No. 25 at 10). However, Defendants argue that "[w]hile the provision of police is essential to the public and . . . the training of recruits is essential to providing public service, there is no direct link between the academy training and the public." (ECF No. 26 at 7). Rather, the Academy is a "private service" provided to people who decided to become police officers. (*Id.* at 8). For the reasons discussed in

the previous section and expanded upon below, the Court agrees with the Defendants and finds that the services offered by the Academy are not of the type that would prompt nullification based on public policy. If anything, public policy supports the Court's enforcement of the Waiver.

As a threshold matter, "Maryland courts have been hesitant to strike down voluntary bargains on public policy grounds," because of the effect it would have on the public interest in making legally enforceable promises. *Maryland-Nat'l Capital Park & Planning Comm'n v. Washington Nat. Arena*, 282 Md. 588, 606 (1978). As articulated above, the training offered by the Academy is not an essential public service that could prompt the voiding of a Waiver. Moreover, if places like the Academy are unable to shield themselves from the risks associated with combat training exercises through exculpatory clauses, it is reasonable to expect either one of two things to happen: (1) such training would not be provided; or, (2) such training's intensity would be severely decreased. Either way, the public is left with fewer means to realistically train public safety officials. Accordingly, the Court will not strike down the Waiver on public policy grounds.

For the above reasons, Defendants have shown that the terms of the Waiver clearly and unambiguously cover Plaintiffs' negligence based claims and that the Waiver does not fall within an exception to enforceability recognized under Maryland law. Therefore, the Court holds that the Waiver is valid and enforceable.[1]

## IV. CONCLUSION

Having found that the Waiver is valid, enforceable, and covers the conduct alleged to be negligence by the Plaintiffs, this Court finds that Defendants demonstrated that there is no

---

[1] Since the Court holds that the Waiver is enforceable and releases Defendants from all negligence based claims, there is no need to address Defendants' arguments pertaining to assumption of risk.

15

genuine dispute of material fact as to the negligence based counts.  Therefore, Defendants' Motion for Summary Judgment/ Partial Summary Judgment as to counts I through VI is GRANTED.  The Parties have fourteen (14) days from this memorandum and accompanying order to file a jointly proposed scheduling order for proceeding with discovery on the remaining counts. A separate Order shall follow.

Dated: July 2, 2019                                          /s/
J. Mark Coulson
United States Magistrate Judge